REVISED, July 12, 2000

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 99-40154

_____

TAYLOR PUBLISHING COMPANY,

Plaintiff-Appellant-Cross-Appellee,

versus

JOSTENS INC,

Defendant-Appellee-Cross-Appellant.

Appeals from the United States District Court
For the Eastern District of Texas

July 10, 2000

Before JOLLY, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Taylor Publishing Company ("Taylor") sued Jostens, Inc. ("Jostens"), alleging antitrust violations and related torts. After a jury found in Taylor's favor on all but one of its claims, the trial court granted judgment as a matter of law for Jostens. Taylor appeals, and we affirm.

# I

Jostens and Taylor are competing school yearbook manufacturers. They are part of a national market with two other major competitors. Jostens has the largest market share, at somewhere between 40% and 50%. Taylor and Herff-Jones Company ("Herff-Jones") follow, each with about 20% of the market. Walsworth has about a 10% share and LifeTouch holds a minor share. Before Herff-Jones acquired it in 1996, Delmar was another major participant. Only Jostens, Taylor, and Herff-Jones compete nationally at all educational levels.

The yearbook market is static in several regards. The customer base is fairly fixed, meaning that each company competes for business from the same schools. Also, because the business is annual, opportunities to compete are practically limited to certain times during the year. Contracts between manufacturers and schools are typically negotiated once a year, and the remainder of the year is spent preparing the individual school's yearbook. The manufacturer's sales representative works with school staff and students to prepare a single yearbook for the school, which is then purchased by students of that school. The entire product is shipped to the school for distribution to its students in a single shipment sometime near the end of the school year.

Schools contract with a single manufacturer at a time, meaning that once a school has chosen a manufacturer for the year, other manufacturers lose their opportunity to acquire that school as a customer until at least the next year. This combines with moderate customer loyalty to reduce the amount of customer exchange and to increase competition for available individual customers.

The relationship between school staff and sales representatives provides a representative with several opportunities to sell services to a school and its students. The most prominent opportunity is when the initial contract is negotiated. At this time, the school commits to a single manufacturer

and sets its initial specifications for that year's yearbook. Because these specifications are typically not final, however, other opportunities to sell services arise during the preparation process. Schools frequently request modifications to their original specifications, which allows the representatives to sell additional services at extra cost.

Although it remained profitable during this period, Taylor lost market share from 1994 to 1997. Two factors allegedly contributed to this loss. First, Taylor experienced production problems in 1994 that led to late deliveries. There was testimony that these and other production problems persisted for at least one school until 1997.

Second, Taylor alleges that Jostens developed a plan in 1994 to become "the only national yearbook company in the United States." This plan was allegedly targeted at Taylor. For example, in a quarterly update, former Jostens Senior Vice-President Jack Thornton stated: "I really think it is in the best interest of our sales people, our employees, customers and shareholders to take Taylor out of business over the next several years." To implement this plan, Jostens allegedly engaged in several practices which form the basis of this lawsuit. According to Taylor, Jostens instituted a campaign to hire away key Taylor sales representatives. It misappropriated confidential Taylor information from these representatives and others which it then used in its sales plans. Additionally, it encouraged its sales representatives to attempt to break multi-year contracts between Taylor and some of its customers. Further, Taylor alleges that Jostens attempted to obtain Taylor customers for itself by offering them cheaper-than-usual contracts which it would then "upgrade" to a higher price by selling additional services. Taylor also alleges that Jostens targeted Taylor customers with predatory pricing by selling them yearbooks at prices below Jostens's cost of production and by giving away free yearbooks through a promotional contest.

Taylor filed this suit against Jostens in the Eastern District of Texas in 1997. Taylor charged Jostens with attempted monopolization in violation of § 2 of the Sherman Act, price discrimination in violation of the Robinson-Patman Act, and the state law torts of tortious interference with contracts (both sales representatives' and customers' contracts), knowing participation in the breach of fiduciary duties, conspiracy in breach of duties, and unfair competition.

The case was tried before a jury, which found in Taylor's favor on most of its claims: attempted monopolization, illegal price discrimination, tortious interference with contracts between Taylor and its employees, knowing participation in the breach of fiduciary duties, conspiracy in breach of duties, and unfair competition. The jury ruled in Jostens's favor only on Taylor's claim that Jostens tortiously interfered with its contracts with its customers. The jury awarded damages on each claim, and to avoid repetition of damages, the district court entered judgment for Taylor on its attempted monopolization claim in the amount of $25,225,000.

Jostens moved for judgment as a matter of law and for a new trial. The court granted Jostens's motion for judgment as a matter of law as to each count and vacated the judgment for Taylor. *See Taylor Publishing Co. v. Jostens, Inc.*, 36 F. Supp. 2d 360 (E.D. Tex. 1999). Taylor appeals. Jostens cross-appeals on a single issue: whether the district court erred when it granted Jostens's JML motion but did not rule on its alternative motion for a new trial.

**II**

Taylor asserts that the district court erred by considering Jostens's post-judgment motion for judgment as a matter of law ("JML") because Jostens waived the right to file a post-judgment JML motion by not moving for Rule 50 judgment at the close of all evidence. We disagree.

A motion for JML "may be made at any time before submission of the case to the jury." Fed.

R. Civ. P. 50(a)(2). Rule 50(b) allows the moving party to renew that motion after judgment. It is well-established that to preserve the right to file a Rule 50(b) motion the moving party must first request JML at the close of all evidence. *See* Fed. R. Civ. P. 50(b); *Tamez v. City of San Marcos*, 118 F.3d 1085, 1089 (5th Cir. 1997). However, "[w]e have approached this requirement with a liberal spirit." *Alcatel USA, Inc. v. DCI Tech. Inc.*, 166 F.3d 772, 781 (5th Cir. 1999); *see also Polanco v. City of Austin*, 78 F.3d 968, 974 (5th Cir. 1996) (same). Therefore, "this court has not required strict compliance with Rule 50(b) and has excused technical noncompliance where the purposes of the requirement have been satisfied." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1244 (5th Cir. 1997); *see also Scottish Heritable Trust v. Peat Marwick Main & Co.*, 81 F.3d 606, 610 (5th Cir. 1996) ("Technical noncompliance with Rule 50(b) may be excused in situations in which the purposes of the rule are satisfied."); *Polanco*, 78 F.3d at 974 ("Technical noncompliance with rule 50(b) is gauged by whether the purposes of the rule are satisfied, not by a formula regarding the number of witnesses, the amount of testimony, or the passage of time after the initial motion.").

The requirement that a party file a motion for JML before the case is submitted to the jury "serves two basic purposes: to enable the trial court to re-examine the sufficiency of the evidence as a matter of law if, after verdict, the court must address a motion for judgment as a matter of law, and to alert the opposing party to the insufficiency of his case before being submitted to the jury." *Polanco*, 78 F.3d at 974 (quoting *MacArthur v. University of Tex. Health Ctr.*, 45 F.3d 890, 897 (5th Cir. 1995)). "These purposes are met when the court and the plaintiff are alerted to the grounds on which the defendant contends the evidence is insufficient prior to the submission of the case to the jury." *Greenwood*, 111 F.3d at 1244-45; *see also Polanco*, 78 F.3d at 974-75 ("Thus, even when substantial evidence is presented after the motion, we may still find that only a 'de minimis' departure

-5-

from the 50(b) requirement has occurred if the court and the opposing party have been put on notice, before the case goes to the jury, that the plaintiff's proof may be lacking."). When these purposes are met, we routinely excuse technical noncompliance with the pre-submission requirement by invoking a "*de minimis*" exception to the rule. *See, e.g., Greenwood*, 111 F.3d at 1244-45; *Tamez*, 118 F.3d at 1090-91.

The facts here fit within our *de minimis* exception. The trial lasted over six days. To accommodate the parties, witnesses from both sides were taken out of order, resulting in Taylor completing its case-in-chief after its own rebuttal case and after Jostens's case-in-chief. Near the end of trial, Jostens inquired as to the best time for presenting its Rule 50 motion. Jostens's attorney indicated that he wanted to present his motion after Taylor had concluded its case. The court stated that it would consider the motion timely filed, but wished to consider it "after we finish the evidence." Jostens agreed to postpone the motion until then, and Taylor did not object.

Later that afternoon, Taylor completed its rebuttal evidence. At that point Taylor still had three pieces of video deposition testimony—the conclusion of its case-in-chief—which it wished to present the following trial day. The court allowed Jostens to present its Rule 50 motion orally and heard Taylor's response. It then took the motion under advisement until the following morning of trial, and it immediately inquired about the substance of Taylor's remaining deposition testimony.

The following morning of trial, the court reviewed the jury instructions with the parties. The court again inquired about Taylor's remaining evidence. Taylor reaffirmed that the three video deposition excerpts would complete its case, and it again discussed the substance of those depositions. The court, noting that it had transcripts of all three depositions, determined that, because of time constraints, Taylor could only present one video excerpt and that it could introduce the other

two excerpts through transcripts. After a short recess, the court denied Jostens's Rule 50 motion. Taylor then presented its remaining evidence, and the parties made their closing arguments.

In light of these facts, we find that any noncompliance by Jostens with Rule 50(b) was "a technical, formalistic defect, not a substantive one," *Tamez*, 118 F.3d at 1090, such that the *de minimis* exception should apply. First, the district court repeatedly expressed its intent to reserve ruling on Jostens's Rule 50(b) motion until all evidence had been presented. *Cf. Alcatel*, 166 F.3d at 781 (noting that one factor favoring the application of the *de minimis* exception is the trial court's reservation of its decision on the motion until later); *Polanco*, 78 F.3d at 975-76 (same). Moreover, the only evidence presented after Jostens made the Rule 50(b) motion was the three pieces of deposition testimony. *See Alcatel*, 166 F.3d at 781 (finding that the fact that little evidence was presented between when the Rule 50(b) motion was made and closing favored application of the *de minimis* exception). This testimony took very little time to present. *See id.* (stating that an elapse of only a small amount of time between the motion for JML and the conclusion of all evidence also favors the application of the *de minimis* exception, and adding that an intervening weekend and Monday—as occurred here—was not a relevant lapse). Moreover, as the district court itself noted in rejecting Taylor's waiver argument, both the court and the parties were aware of the substance of Taylor's remaining evidence at the time the motion was argued. By the time it denied the motion, the district court had before it all of the evidence Taylor subsequently presented.

Given these circumstances, any deviation from full compliance with Rule 50(b)'s mandate that Jostens's motion be made and ruled on at the close of the evidence was minor and did not frustrate the rule's purposes. Jostens's JML motion fully alerted the court and Taylor of the grounds on which Jostens believed the evidence was insufficient prior to the case's submission to the jury such that

-7-

Taylor was not "blindsided" by Jostens's post-judgment renewal of the motion. *See Greenwood*, 111 F.3d at 1244-45; *Polanco*, 78 F.3d at 974-75. To find that Jostens waived its right to move for JML post-judgment under these circumstances "would constitute a 'slavish adherence' to the Rules, a position which we have repeatedly counseled against." *Scottish Heritable Trust*, 81 F.3d at 611. Accordingly, we conclude that the district court correctly rejected Taylor's Rule 50(b) waiver argument and considered Jostens's post-judgment motion for JML.

In addition to arguing that Jostens waived its right to bring a general post-judgment Rule 50 motion, Taylor argues that Jostens waived its right to raise specific claims in its post-judgment motion. A post-judgment Rule 50 motion "may not enlarge or assert new matters not presented in the [pre-verdict] motion for directed verdict." *Dimmitt Agri Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 521 (5th Cir. 1982); *see also* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2537, at 344-45 (1995) ("Since the post-submission motion is nothing more than a renewal of the earlier motion made at the close of the presentation of the evidence, it cannot assert a ground that was not included in the earlier motion."). However, we generally hold that "technical precision is not necessary in stating the grounds for the motion (for directed verdict) so long as the trial court is aware of the movant's position." *Dimmitt*, 679 F.2d at 521. Typically, this involves an inquiry into whether the evidence and law supporting the pre-submission challenge are the same as the evidence and law supporting the post-judgment challenge. *Compare McCann v. Texas City Refining, Inc.*, 984 F.2d 667, 672 (5th Cir. 1993) (holding that a party waived a post-judgment challenge to the sufficiency of the evidence supporting the plaintiff's showing of liquidated damages when the defendant's only pre-submission challenge was to the evidence supporting the plaintiff's showing of compensatory damages; noting that the two types of damages require

"completely different evidence") *with Dimmitt*, 679 F.2d at 521 (finding that a defendant preserved its right to argue post-judgment that its market share was legally inadequate to support a monopolization claim because the defendant argued pre-submission that the plaintiff failed to show it possessed market power; noting that the evidence for the two claims was the same).

Taylor cites several specific arguments which Jostens allegedly waived by failing to mention them specifically in its initial JML motion. We have reviewed each of Taylor's waiver claims and find that on each occasion, the grounds on which Jostens initially claimed entitlement to JML were sufficiently similar to its post-judgment JML motion to preserve them. On each occasion, both motions referred to the same evidence and same legal claim. Mandating any greater specificity would unnecessarily elevate technical phrasing over the actual purpose of requiring one party to challenge specific elements of the other party's case before it is submitted to the jury.

Having found that Jostens adequately preserved (1) its right to move post-judgment for JML and (2) its specific challenges to different aspects of the judgment, we next review the court's grant of JML to Jostens. We review this *de novo*, applying the same standard as the district court. *See Morante v. American Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998). Thus, we look to whether the court correctly found that "there is no legally sufficient evidentiary basis for the jury to find" as it did. Fed. R. Civ. P. 50(a); *see also Morante*, 157 F.3d at 1009 (same).

**III**

Section 2 of the Sherman Act prohibits attempted monopolization. *See* 15 U.S.C. § 2.[1] The jury found for Taylor on its attempted monopolization claim, but the trial court granted JML on this claim in favor of Jostens.

**A**

An attempted monopolization claim has three elements: (1) the defendant engaged in predatory or exclusionary conduct, (2) the defendant had a specific intent to monopolize, and (3) there was a dangerous probability that the defendant would successfully attain monopoly power. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993); *cf. Northeastern Tele. Co. v. American Tele. and Telegraph Co.*, 651 F.2d 76, 85 (2d Cir. 1981) ("[T]he conduct requirement is arguably the single most important aspect of this offense."). The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate "ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 455-56, 113 S. Ct. 884.

An attempted monopolization claim necessarily involves conduct which has not yet succeeded; otherwise, the plaintiff would bring an actual monopolization claim. *See Multiflex v. Samuel Moore & Co.*, 709 F.2d 980, 990 (5th Cir. 1983) ("Attempted monopolization under section 2 is usually defined as an unsuccessful attempt to achieve monopolization."). Whereas in an actual

---

[1] Section 2 provides in its entirety that:
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.
*Id.*

monopolization case we focus on the harm done, in the form of a monopolization which the defendant willfully creates or maintains, *see United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966), in an attempt case we focus on the harm that potentially might have been caused by the conduct in light of the state of the market, *see Multiflex*, 709 F.2d at 994 ("The offense of attempted monopolization need not cause actual market damage, but need merely threaten to produce the type of market damage contemplated in the antitrust laws."). Thus, we look to the defendant's conduct and the market at the time the conduct occurred, rather than evaluating the conduct's effects after-the-fact. *See United States v. American Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984) ("When evaluating the element of dangerous probability of success, we do not rely on hindsight but examine the probability of success at the time the acts occur."). The actual effects of a defendant's conduct might be relevant to determining its predatory nature, the defendants's intent, or the state of the market. However, actual effects are not by themselves necessary to sustain an attempted monopolization claim. Instead, we have upheld attempted monopolization claims even when the plaintiff suffers no harm from the defendant's actions, provided the plaintiff shows the requisite conduct, intent, and risk of success. *See*, *e.g.*, *Multiflex*, 709 F.2d at 999 (affirming a jury's finding of attempted monopolization even though during the relevant time period the plaintiff's market share increased and the defendant's decreased).

This appeal hinges on whether Jostens's conduct is predatory.[2] "'Exclusionary' conduct is

---

[2] We use the terms "predatory" and "exclusionary" interchangeably to refer to conduct which can support an attempted monopolization claim under § 2 of the Sherman Act.

Taylor attempts to use its evidence of intent to bolster its proof of predatory conduct. In certain circumstances, a showing of intent may be relevant to establishing predatory conduct. *See* 3A Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW § 805c, at 326 (1996) ("[I]ntent retains its customary role as an aid in characterizing ambiguous conduct."); *id.* § 806e, at 337 (discussing the relationship between market power and conduct). While we have endorsed this approach in the past, *see*, *e.g.*, *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 38 n.9 (5th Cir. 1972) ("In short, when a firm displays an anti-competitive animus in the operation of an otherwise ambiguous business practice,

conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power."  3 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 651, at 82 (1996); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985) ("[E]xclusionary comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.") (quoting 3 P. Areeda and D. Turner, ANTITRUST LAW 78 (1978)).  To determine whether conduct is exclusionary, we look to the proffered business justification for the act.  Where "the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999).  However, "[n]ot all 'unfair' conduct—even by a monopolist and a fortiori by one who is not—fits within the prohibition of § 2.  Conduct must not only be inconsistent with competition on the merits, it must also have the potential for making a significant contribution to monopoly power."  3A Areeda & Hovenkamp ¶ 806d, at 331.

Taylor alleges that Jostens engaged in several types of predatory conduct:  (1) "sham pricing,"

what the firm seeks to accomplish provides as sure an indicator of the actual effect of the practice on competition as can be found in the shifting sands of antitrust litigation. "), we have required some link between the intent and the conduct.  That is, to be relevant to conduct, the intent must explain the specific conduct.

Taylor's intent evidence does not sufficiently explain Jostens's conduct, for example, by explaining why Jostens engaged in below-cost pricing. *Cf., e.g.*, *id.* (discussing the defendant's "motivation in denying price support to Lehrman"); 3A Areeda & Hovenkamp § 805c, at 325 (giving an example of how the defendant's purpose for engaging in specific conduct might make conduct that otherwise seems predatory be non-predatory).  Instead, it merely identifies a general intent by Jostens to become the dominant market participant.

In addition to determining that none of Jostens's conduct was predatory, the district court ruled on the other elements of Taylor's Sherman Act claim:  intent and dangerous probability of success.  On appeal, the parties dispute the district court's dangerous probability finding, but in light of our disposition here, we do not reach this issue.

by luring Taylor customers away with low price offers which it would then increase by offering additional, overpriced services; (2) predatory pricing, by luring Taylor customers away with below-cost pricing; (3) predatory hiring, by approaching and luring away key Taylor sales personnel; (4) misappropriation of confidential information; and (5) inducing Taylor customers to breach their term contracts with Taylor.[3]

**1**

Taylor's sham pricing claim is based on Jostens's alleged practice of inducing Taylor customers to switch their services to Jostens by offering them deceptively low prices. Taylor showed that Jostens persuaded numerous Taylor customers each year to switch to Jostens by offering them lower contract prices than Jostens offered its own renewal customers. Jostens then sold many of these former Taylor customers additional services, sometimes at above list price, which increased the original contract price.[4] There was some evidence that Jostens specifically encouraged its sellers to engage in these "upgrades" with customers to recoup the initially low contract price Jostens used to attract those customers.

Taylor argues that these sales methods involved sham pricing, whereby Jostens obtained customers by using low contract prices it had no intention of honoring. Under Taylor's view of the facts, customers regularly change their yearbook specifications after signing the initial contract. Knowing this, Jostens attracted customers with lower-than-usual contract prices. It then recouped its discount from certain customers by aggressively encouraging them to change their specifications.

---

[3]    Taylor argued below that Jostens engaged in predatory disparagement of Taylor's services. Taylor does not renew this argument on appeal, and thus we do not consider it.

[4]    Taylor expert Bryan Jones testified that Jostens "upgraded" 80% of the customers it attracted from Taylor. Significantly, however, he testified that only 25% of these customers ended up paying more on their Jostens contract than they paid the previous year on their Taylor contract.

Most telling, a former Jostens sales representative suggested Jostens encouraged its representatives to charge schools obtaining a discount more than list price for the upgrades in an attempt to recoup that school's discount.

Antitrust law is rife with similar examples of what competitors find to be disreputable business practices that do not qualify as predatory behavior. *See, e.g.*, *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 56 (2d Cir. 1979) (finding that a newspaper's notice to advertisers guaranteeing a certain Sunday circulation level "For a Minimum of Four Weeks" was not predatory, even though the notice did not mention that the Sunday edition would be given free to existing subscribers for five weeks only). *See generally Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (quotations omitted). Taylor has not shown that Jostens's sham pricing is any different from the conduct in these cases. Taylor does not argue that Jostens refused to honor the contract price it initially used to attract Taylor customers. Nor does it argue that the contract prices Jostens offered to Taylor customers were below cost, such that Jostens was losing money selling to these customers and was therefore only selling at this price to harm Taylor. *Cf. Abcor Corp. v. Am Int'l, Inc.*, 916 F.2d 924, 928 (4th Cir. 1990) (finding that a scheme of selling services at a lower rate than a competitor was not exclusionary conduct in part because the pricing was not below cost). Finally, Taylor does not argue that the initial contract quotes were on their face deceptive (*e.g.*, they purported to cover more services than Jostens subsequently provided), that Jostens forced the customers it attracted to accept

upgrades, that the customers misunderstood the initial terms of the contract, or that they were locked into service with Jostens for more than one year.

Under these facts, Taylor has not shown that the sham pricing was predatory. *See Aspen Skiing*, 472 U.S. at 605 n.32, 105 S. Ct. 2847 ("[E]xclusionary comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way."). Jostens negotiated contracts with Taylor customers without deceiving them as to the actual price or what it covered, giving them lower prices than Taylor was offering. This aspect of Jostens's pricing was fully consistent with competition on the merits. *Cf. Stearns Airport*, 170 F.3d at 524-25 ("Inferring an attempt to circumvent competition on the merits is extraordinarily difficult when the alleged violator takes the facially rational and unproblematic step of attempting to sell its product, couches its arguments to the customer in favor of a sale on the merits of the product and procedures it recommends, and the consumer agrees."). Jostens then negotiated upgrades with large numbers of those customers without deceiving them about the need for the additional services and without refusing to honor the former deals. While this intentionally resulted in some customers paying more than they otherwise would have, absent a showing of actual deception or inability on the customers' part to switch back, Jostens's acts resulted in customers having the opportunity (which many of them took) to acquire yearbooks at lower prices than otherwise available. This was not anticompetitive because it allowed customers to obtain services at a lower cost than they otherwise would have received. Indeed, Taylor's damages expert testified that only 25% of former Taylor customers ended

-15-

up paying more with Jostens than they would have had they remained with Taylor.[5]

**2**

Taylor next alleges that Jostens lured Taylor customers away through predatory pricing. A predatory pricing claim has two elements: "1) the prices complained of are below an appropriate measure of the alleged [would-be] monopolist's costs and 2) . . . the alleged [would-be] monopolist has a reasonable chance of recouping the losses through below-cost pricing." *Stearns Airport*, 170 F.3d at 528 (discussing an actual monopolization claim based on predatory pricing). Predatory pricing claims challenge behavior which "is difficult to distinguish from conduct that benefits customers" and which, because the goal of such behavior is difficult to attain, is "unlikely to be attempted by rational businessmen." *Id.* at 527-28; *see also Brooke Group*, 509 U.S. at 226, 113 S. Ct. 2578 ("[P]redatory pricing schemes are rarely tried, and even more rarely successful, and the costs of an erroneous finding of liability are high.") (quotations and citation omitted). Accordingly, "[t]he Supreme Court has expressed extreme skepticism of predatory pricing claims," and we have held that "the standard for inferring an impermissible predatory pricing scheme is high." *Stearns Airport*, 170 F.3d at 527-28.

Taylor's main allegation of predatory pricing is that Jostens lured several Taylor customers away by giving them discounts of more than 35%. Because Taylor's average variable cost ("AVC") was allegedly 65% of its usual price, a discount of more than 35% would be below AVC.[6] Taylor

_____

[5] Additionally, Jostens could never obtain a monopoly through this conduct. *See* 3A Areeda & Hovenkamp § 806a, at 327 ("Regardless of the defendant's power or intent, its conduct may be incapable of producing monopoly, and thus unable to satisfy the attempt requirement."). Customers actually upset about the ultimate prices and services they obtained could switch back to another manufacturer.

[6] We have endorsed average variable cost as an appropriate measure of below-cost pricing for purposes of determining predatory pricing. *See id.* at 532. "Average variable cost is the costs that vary with changes in output divided by the output." *International Air Industries, Inc. v. American Excelsior Co.*, 517 F.2d 714, 724 n.27(5th Cir.

-16-

bolsters this argument by identifying aspects of Jostens's pricing practices which allegedly foster this kind of predatory pricing, including allowing its representatives to set their own prices, having them ask competitors' customers what the competitors are charging, asking the customer to set its preferred price, and giving more frequent and deeper discounts to new customers than it gives to its repeat customers.

Taylor expert Bryan Jones testified that Jostens lured away up to twenty-seven customers per year between 1995 and 1997. These lost customers represented a tiny portion of Taylor's total business, as Jones also testified that Taylor had at least 6,500 customers during each of the relevant years. Thus, Taylor never lost more than two-fifths of one-percent of its customers to Jostens's below-cost pricing in any one year.[7]

On these facts, Taylor cannot show that Jostens could recoup the money it lost through its below-cost pricing. *See id.* at 528. To show recoupment, the plaintiff must "demonstrate that the scheme could actually drive the competitor out of the market" and that "the surviving monopolist could then raise prices to consumers long enough to recoup his costs without drawing new entrants to the market." *Id.* at 528-29. This is impossible here given the minimal below-cost pricing in which Jostens engaged.[8] *See id.* at 529 (finding no possibility of driving competitors from the market, in

1975). Variable costs are costs that "vary with the amount produced," and include "inputs like hourly labor, the cost of materials, transport, and electrical consumption at a plant." *Stearns Airport*, 170 F.3d at 532. Since Jostens has not challenged Taylor's estimation of its AVC on appeal, we accept Taylor's estimates as correct.

[7]    Jones testified that Taylor had 7,337 customers in 1994, 6,977 in 1995, 6,832 in 1996, and 6,576 in 1997. He stated that Taylor lost the following numbers of customers to Jostens's below-cost pricing: twenty-seven in 1995, twenty-six in 1996, and thirteen in 1997.

[8]    This same shortcoming applies in even greater measure to Taylor's challenge to a Jostens promotional contest. In return for potential customers agreeing to a sales meeting with a Jostens representative, the customers were entered in a drawing to be one of four schools nationwide (one in each of four geographic regions) to receive a year's worth of free yearbooks from Jostens. This very limited promotion presented no risk of driving Taylor from the market and thereby allowing Jostens to recoup the allegedly predatory discounts. *See Buffalo Courier-*

part because of the isolated nature of the predatory pricing; the plaintiff showed underpricing on five bids out of a total of between 240 and 400 bids); *cf. Matsuhita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 590, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ("[I]f predatory pricing conspiracies are generally unlikely to occur, they are especially so where, as here, the prospects of attaining monopoly power appear slight.").[9]

We have previously rejected predatory pricing claims under similar circumstances. In *Bayou Bottling, Inc. v. Dr Pepper Co.*, 725 F.2d 300, 305 (5th Cir. 1984), we rejected a soft drink distributor's claim that another distributor was predatorily pricing one size of bottled drink. Quoting from the Ninth Circuit, we stated that "[t]he pricing of one size at a predatory level would not necessarily drive out rivals who were selling a full line, . . . unless this placed the overall price at the predatory level." *Id.* at 305 (quoting *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 856 (9th Cir. 1977)); *see also Morgan v. Ponder*, 892 F.2d 1355, 1362 (8th Cir. 1989) ("Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer. Although these cases differ somewhat in their analytical approaches, all focus on the basic question of whether the alleged predatory act poses a genuine threat to the overall competition.") (citations omitted). While *Bayou* involved underpricing on one product out of many carried by competitors, its directive that we look to the competitors'

---

*Express*, 601 F.2d at 55 (finding that a five-week promotion where one newspaper gave its new Sunday edition to subscribers for free was not predatory because the plaintiff newspaper "introduced no proof that sampling for [this period] was unusual" or "that the five week sampling would produce even a short-term loss for the [plaintiff's] operation taken as a whole").

[9] William Avera, a Taylor expert, testified that Jostens's below-cost pricing harmed Taylor beyond simply depriving it of some customers. Avera stated that Taylor was also harmed when it was forced to match Jostens's prices to retain some of its other customers. Taylor's ability to retain customers in this manner shows that Jostens could not recoup its below-cost prices by "driving [Taylor] from the market, or . . . causing [it] to raise [its] prices to supracompetitive levels within a disciplined oligarchy." *Brooke Group*, 509 U.S. at 225, 113 S. Ct. 2578.

entire business is apposite here, indicating that minimal below-cost pricing by Jostens cannot support a predatory pricing claim.

**3**

Taylor also points to Jostens's hiring of several key Taylor sales personnel as predatory conduct. Taylor asserts that Jostens approached and hired key Taylor employees without a valid business purpose in an effort to "convert" Taylor customers to Jostens and acquire confidential information.

The record indicates that Jostens went to substantial lengths to acquire the services of many Taylor employees, from mid-level executives to sales representatives.[10] Taylor's primary complaint is Jostens's hiring of three key former Taylor sales representatives: Jeff Graffam, Dan DeFalco, and Jan DeFalco (née Day).

"[H]iring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and strengthen a monopolist . . . [because] there is a high social and personal interest in maintaining a freely functioning market for talent." 3 Areeda & Hovenkamp ¶ 702b, at 141; *see also Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 894 (5th Cir. 1984) ("*Page* supports the view that the mere hiring away of employees from a rival is lawful. The fact that the employee then uses her own skills and contacts—and not, for example, misappropriated trade secrets—to generate business for her new employer, even at the expense of her old employer, provides no basis for antitrust liability."); *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d

_____

[10] For example, notes from an interview between a Jostens executive and former Taylor employee Cole Harris reflect an occasion where Jostens asked Harris to describe 42 Taylor sales representatives to Jostens, their respective accounts, and their effectiveness. In those notes, which Jostens used to choose which Taylor sales representatives to pursue, Jostens noted that Dan DeFalco was the "lynchpin" of the organization, that school principals "love him and are addicted to him," and that it "would be a coup to get him."

1342, 1354 (5th Cir. 1980) ("[T]he mere hiring away of employees from a rival is per se legal under the antitrust laws."). Accordingly, merely seeking out the services of Taylor's employees is not predatory.

Taylor argues that Jostens sought the services of these employees not to fill a legitimate business need, but rather "to deprive Taylor of the goodwill and other relationships existing between the representatives and their customers, thereby crippling Taylor and reaping the benefits from its customers." This allegation, however, proves that Jostens's hiring of Taylor's employees was not predatory. "*Unlawful* predatory hiring occurs when talent is acquired not for purposes of using that talent but for purposes of denying it to a competitor." *Universal Analytics, Inc. v. MacNeal-Schwendler Corp.*, 914 F.2d 1256, 1258 (9th Cir. 1990) (emphasis added).[11] Jostens hired Graffam and the DeFalcos precisely because it believed they would increase its business—former Jostens Senior Vice-President Jack Thornton's statement that signing Dan DeFalco "would bring over his $1.4 million beginning with the next Fall deliveries" proves the point. The negative impact of these employee defections on Taylor, while inevitable, was incidental to Jostens's primary goal: the acquisition of employees whose talents it sought to exploit in an effort to increase sales. *See Universal Analytics*, 914 F.2d at 1259 (describing that while "one reason for the hirings was to disadvantage the competition . . . [the] primary motivation was to obtain . . . productive employee[s]").

Taylor also argues that Jostens's hiring conduct was predatory because it was designed to

---

[11] As an example of when the hiring away of a competitor's employees would become predatory, Areeda and Hovenkamp describe a dominant computer software firm who hires away all of its rivals' best programmers and, because it has enough of its own programmers, employs them as custodians paid the salaries of computer programmers rather than custodians. *See* 3 Areeda & Hovenkamp ¶ 702c, at 143. The case at bar is not analogous; rather, it would be equivalent to the dominant computer software firm hiring its rivals' best programmers and promoting them to supervisory roles in which they would use their skills to the company's benefit.

induce former employees to breach common law duties of loyalty and contractual non-compete clauses. As described above, the mere hiring away of a rival's employees is legal under the antitrust laws in part because of the desirability of maintaining a free market for an employee to sell her talents. However:

> No similar virtue would redeem efforts to induce such disloyal performance by a rival's employee as disclosure of trade secrets or other private information; steering customers, researchers, or others away from her employer and to the monopolist; physical or psychological sabotage; or intentionally lax performance.

3A Areeda & Hovenkamp ¶ 782e, at 264; *see also Associated Radio*, 624 F.2d at 1354.

The record provides significant evidence that Jostens expected former Taylor employees to steer their former customers away from Taylor and toward Jostens, no matter what their remaining commitments to Taylor. Specifically, the record contains significant evidence that Jostens expected the DeFalcos (even though they had non-compete agreements with Taylor) and Graffam to "convert" their accounts to Jostens. Moreover, the record reflects that Jostens attempted to hire away many more of Taylor's sales employees for similar purposes, and that Jostens contemplated circumventing non-compete agreements in an arguably legal, but certainly dubious, manner.[12]

Relying heavily on the treatise of Professor Areeda and, at that time, Professor Turner, we held in *Associated Radio* that an act of predatory hiring combined with encouraging the "steering [of]

---

[12] For example, Jostens sought to hire Taylor employee Thurlow Cooper, have him "convert" his accounts to Jostens without direct participation to avoid violating his non-compete agreement with Taylor, and then take the accounts over once the term of that agreement ended. Jostens stated that:

> If we converted all of [Cooper's] business (I believe we would because Jeff Graffam will just roll over like he did for Cole), and split 50/50, that would be $25,000 toward the $40,000 [we would have to pay Cooper to compensate him for his lost commissions for leaving Taylor].. . . After two years [once his non-compete agreement had ended] Mr. Cooper would get the business back at full commission . . .. This scenario, to me at least, would seem to be in the best interest of everyone involved with the exception of [Taylor].

customers . . . away from [the employee's] employer and to the monopolist" could be an exclusionary practice under § 2. However, in *Adjusters Replace-A-Car*, we limited this part of *Associated Radio* to finding predatory hiring actionable under § 2 only when "the defendant had induced the plaintiff's employees to act disloyally in steering business toward the defendant while they were evidently still in the employ of the plaintiff." *Adjusters Replace-A-Car*, 735 F.2d at 894.

Here, despite the fact that Dan DeFalco worked for Taylor for several weeks after accepting a position with Jostens, there is no evidence that Jostens induced either him or Graffam to persuade Taylor's customers to switch to Jostens during this time period. However, there is substantial evidence that Jostens desired to circumvent, either directly or subtly, both Dan and Jan DeFalco's non-compete agreements and convert their accounts to Jostens, at least in part using the goodwill developed by these individuals while at Taylor.[13] While it is unclear whether either DeFalco actually violated his or her non-compete agreements, the record reflects that Jostens anticipated a *de facto*, if not a direct, violation which would benefit Jostens.

The district court held that these specific acts were not predatory practices in the antitrust sense because of a lack of evidence that "the actual effect [of these practices] was significant." *See Taylor*, 36 F. Supp. 2d at 370. We believe that the district court's finding in this regard was based upon an erroneous interpretation of the term exclusionary practice. As described above, in attempted monopolization cases a practice is exclusionary if it is "of the type that tends to impair the opportunities of rivals based on something other than competition on the merits," *see Aspen Skiing*,

---

[13]     This evidence includes: (1) the memorandum stating that Dan DeFalco coming over to Jostens "would bring over his $1.4 million, beginning with next Fall's deliveries," despite his non-compete agreement; (2) the fact that the DeFalcos' conduct after moving to Jostens allowed Taylor to obtain a preliminary injunction from a federal judge in the Eastern District of Virginia preventing further violations of their non-compete agreements; and (3) the memorandum describing in detail how Jostens would get around Taylor employee Thurlow Cooper's non-compete agreement.

472 U.S. at 605, 105 S. Ct. at 2859, irrespective of the actual effect of the practice on the particular competitor.  Here, Taylor is only charging Jostens with *attempt* to monopolize the scholastic yearbook market; mandating that it prove that Jostens's conduct had a significant actual effect on the market would elevate the requisite level of proof in attempt cases to that necessary in an actual monopolization case.

The district court's interpretation of the law came expressly from our decision in *Associated Radio*, and our statement that:

> [T]he concept of 'exclusionary' practice would become totally unmanageable unless the judges are willing to adopt a de minimis test and to ignore those practices that seem unlikely to have made a substantial impact upon the achievement, maintenance, or expansion of monopoly power.

*Associated Radio*, 624 F.2d at 1355; *see also id.* ("We agree . . . that a *de minimis* rule should be applied by our courts.").  However, we believe the court applied the *de minimis* rule incorrectly.  Under *Associated Radio*, to prove that a practice is exclusionary in attempt cases, plaintiffs must only prove that the particular practice was capable, if fully successful, of injuring competition.  Accordingly, to prove that conduct was exclusionary in attempt cases, one need not produce evidence of the actual effect of that practice on the market, but proof of the *potential* effect.  *Compare* 3A Areeda & Hovenkamp ¶ 806d, at 331 ("Not all 'unfair' conduct . . . fits within the prohibition of § 2.  Conduct must not only be inconsistent with competition on the merits, it must also have the potential for making a significant contribution to monopoly power."); *id.* ¶ 806c, at 330 ("More precisely, it must be shown that the improper practices made or were likely to have made a contribution that may be reasonably deemed substantial or significant to the defendant's monopoly power."); *with id.* ¶ 782, at 259 (in the actual monopolization context, "[t]he antitrust court must,

therefore, insist on a preliminary showing of significant and more-than temporary harmful effects on *competition* (and not merely on a competitor or customer) before considering a tort an exclusionary practice."). We agree with Taylor that the contrary viewpoint, expressed by the district court, would negate our previous statement that "[t]he offense of attempted monopolization need not cause actual market damage, but need merely threaten to produce the type of market damage contemplated in the antitrust laws." *Multiflex*, 709 F.2d at 994.

The district court overturned the jury's finding of exclusionary conduct because Taylor only alleged that Jostens raided 1.5% of its sales force, resulting in a loss of less than 1% of Taylor's customers; therefore, Jostens's "hiring of the 3 representatives had a negligible impact upon [Taylor's] competitive position." *Taylor*, 36 F. Supp. 2d at 370. This was incorrect. Taylor provided evidence that Jostens's practice of "converting" accounts by acquiring Taylor sales force and circumventing its non-compete agreements could, potentially, harm competition by putting it out of business.[14] Accordingly, there was sufficient evidence that this was an exclusionary practice which "would be grounds for section 2 liability if the actual effect was significant." *Associated Radio*, 624 F.2d at 1354. The "actual effect," however, is relevant not to whether Jostens's conduct was an exclusionary practice, but rather to whether that exclusionary practice entailed a "dangerous probability of success."

We hold, therefore, that this component of Jostens's actions—attacking Taylor employees with the intent to circumvent non-compete clauses and convert Taylor accounts to Jostens—constituted exclusionary conduct because it could, if fully successful, affect competition. This, of course, is not dispositive of the § 2 claim, because exclusionary practices only produce

---

[14] Thornton admitted as much during his testimony at trial.

antitrust liability in attempt cases if there is, *inter alia*, evidence that the practices caused Taylor specific injury. *See infra* Part III.B (discussing § 4 civil liability).

**4**

Taylor also argues that Jostens's practice of acquiring confidential Taylor information is predatory conduct. The district court found that while Taylor had provided evidence that Jostens "possessed confidential information of [Taylor]," since Taylor had only claimed damages from this amounting to 2% of its total sales, this conduct "does not rise to the level of contributing significantly to creating or maintaining monopoly power." *Taylor*, 36 F. Supp. 3d at 370-71.

As the district court found, it is clear from the record that Jostens acquired substantial amounts of Taylor's confidential information. For the most part, the information acquired by Jostens described Taylor's manufacturing processes, general sales practices, goals, and objectives. Jostens taught courses at its training center, "Jostens University," based in part on such information. Those courses, often taught by former Taylor employees, included "Selling Against Taylor" and "Taylor Publishing Company: Past, Present, Future?"

A review of the record shows that Jostens acquired much of this Taylor information in ways that can best be described as dubious. For example, Jostens somehow acquired a copy of Taylor's confidential strategic plan and objectives for 1996. At trial, when asked about how it had acquired this information, Thornton testified that he had investigated its source but had concluded that "virtually it was untraceable." Thornton's testimony provides the only explanation for how Jostens acquired this information: a copy of this confidential Taylor document was placed in a brown paper bag and left for a Jostens official at a hotel desk.

Other information was acquired by more conventional means. Jostens frequently debriefed

former Taylor employees shortly after it had hired them away from Taylor. The most egregious example identified by Taylor occurred when, less than a week after he was hired by Jostens, former Taylor employee Stephen Garner (who did not have a confidentiality agreement with Taylor) was flown from his home in Topeka to the Jostens division headquarters in Minneapolis to speak about Taylor. Garner there presented a written report on his former employer, which was distributed to Jostens sales managers and other key personnel. The de-briefing of former Taylor employees once they had become part of Jostens's sales force appears to have been common, and may have included the disclosure of some of the Taylor documents found in Jostens's files.

As described above, the district court held that Jostens's acquisition of confidential Taylor information was not predatory in the antitrust sense because, at best, it had only caused Taylor to lose less than 2% of its market share. However, this determination again misinterpreted the meaning of a "predatory practice" in attempted monopolization cases. Plaintiffs in these cases need not produce evidence of a substantial actual effect to prove that a practice was exclusionary; rather, they must prove that a practice could potentially harm competition, as opposed to harming a particular competitor. *See Multiflex*, 709 F.2d at 994 ("The offense of attempted monopolization need not cause actual market damage, but need merely threaten to produce the type of market damage contemplated in the antitrust laws.").

We agree with the district court, however, that Taylor failed to introduce sufficient evidence to prove that acquisition of information concerning Taylor's manufacturing processes, sales techniques, strategies, and goals would harm the market as a whole rather than a particular competitor. A competitive market "is harmed when conduct obstructs the achievement of competition's basis goals—lower prices, better products, and more efficient production methods."

-26-

*Data General Corp. v. Grunman Sys. Support Corp.*, 36 F.3d 1147, 1182 (1ˢᵗ Cir. 1994). Taylor

points to nothing indicating that Jostens's acquisition of this particular information could potentially

harm the competitive process. The cases Taylor cites merely prove that its evidence was inadequate.

*See, e.g., Associated Radio*, 624 F.2d at 1347, 1361 (holding that the misappropriation of engineering

drawings, in conjunction with other conduct, could be exclusionary conduct when those drawings

could be used to damage competition); *id.* ("Plaintiffs contend that by copying [plaintiff's]

engineering drawings and other data, defendants were able to acquire avionics estimated to cost about

$250,000 to $350,000 to produce, thus eliminating the two years of effort required . . . to be

competitive and eliminating the startup losses estimated to cover two and one-half years.")

Accordingly, the practice was not exclusionary.

**5**

Taylor also asserts that Jostens's interference with Taylor's contracts with many of its

customers was exclusionary. The jury's decision that Jostens did not tortiously interfere with

Taylor's contracts with its customers was no doubt informed by the large volume of testimony

Jostens presented from yearbook advisers who stated that they broke their term agreements with

Taylor not because Jostens approached them, but rather because Taylor had failed them in the past.

In light of an abundance of evidence supporting that view, we cannot say that the jury erred

in finding that Jostens did not interfere with Taylor's term agreements with its customers. Even if

we could, however, we note that the leading treatise on the subject argues that such interference

should not be an exclusionary practice cognizable under § 2.

> [W]hile it may be a tort for a defendant to induce another to deal in violation of its
> contract with the defendant's rival, it should not be an exclusionary practice. . . .
> Th[e] competitive effect is neither increased nor decreased when the resource owner

or customer is or is not contractually bound against making that transfer.  If there is a tort, so be it.  But antitrust law should not make liability depend on the existence or nonexistence of contracts that do not affect the competitive results.

3A Areeda & Hovenkamp ¶ 782m, at 269.  Accordingly, Taylor's argument that Jostens interfered with term agreements it had with its customers and therefore is guilty of exclusionary conduct fails.

**6**

To summarize, we find that only Jostens's hiring practices were predatory.  Jostens's sham pricing was not predatory because it was not deceptive or fraudulent.  Jostens's below-cost pricing was not predatory because Taylor did not show that Jostens could recoup its below-cost prices.  Taylor's misappropriation claim failed because Taylor failed to produce evidence that the information Jostens acquired could be used in the marketplace to harm competition.  Taylor's interference with term contracts claim failed because of the lack of evidence that Jostens in fact interfered with Taylor's term contracts.

Nor were these practices predatory when combined.  *Cf. Associated Radio*, 624 F.2d at 1342 ("Probably no one of the instances of improper conduct, standing alone, would lead to a section 2 liability.  Taken together, however, they show a pattern of exclusionary behavior sufficient to support the jury's verdict.").  Taken together, Jostens's conduct—aside from its hiring practices—was more consistent with individual competitive decisions than with an overall plan to compete on grounds other than the merits.  *Cf. id.* (finding that the defendant's behavior was predatory when considered together; the behavior included bribing on contract bids, filing sham lawsuits, encouraging disloyal employee performance, and encouraging the misappropriation of trade secrets).

Even though we find that Jostens engaged in some predatory conduct, we find that Taylor's § 2 claim fails because, as described below, Taylor has not shown that its injuries were caused by

Jostens's conduct. As a result, we do not reach whether Jostens intended to monopolize the relevant market or whether there was a dangerous probability it would succeed.

**B**

Taylor maintained its cause of action under § 4 of the Clayton Act. *See* 15 U.S.C. § 15; *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 675 (5th Cir. 1982) ("Section 4 of the Clayton Act provides a civil cause of action for Sherman Act violations.") (citation omitted). To recover monetary damages for this violation, Taylor must show that its damages were caused by the particular conduct we have found is predatory. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990); *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc.*, 527 F.2d 417, 420 (5th Cir. 1976) ("[Plaintiff's] burden in this suit was to present substantial evidence that illegal practices by [defendant] were a material cause of their injuries."); *Nichols*, 675 F.2d at 675-76 ("Private antitrust liability under § 4 of the Clayton Act requires the showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage. The requirement of the 'fact of damage,' also called 'impact,' means that the antitrust violation must cause injury to the antitrust plaintiff.").

"Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries." *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1383 (5th Cir. 1979) (citation omitted); *see also H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business . . . ."). In some cases, a jury may infer that the defendant's anticompetitive behavior was a material cause of

-29-

the plaintiff's damages from the nature of the behavior and the plaintiff's showing of loss. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123-24, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969). However, "[t]his showing, of course, may not be based on speculation. Rather, the required causal link must be proved as a matter or fact and with a fair degree of certainty." *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 317 (5th Cir. 1978). Here, furthermore, Taylor had to establish a tighter connection between the behavior and the damages, because Taylor concededly also lost customers (*i.e.,* suffered damage) because of its late shipments in 1994 and because of our finding that only some of the conduct challenged—the raiding of Taylor's representatives—was actually predatory. *See H & B Equip.*, 577 F.2d at 247 ("When the plaintiff chooses to rely on specific lost sales, it does so subject to the peril that the proof may show an independent reason why the plaintiff [lost those sales].").

Jostens argues, and the district court agreed, that Taylor's minimal losses to Jostens were due to Taylor's service problems rather than due to Jostens's anticompetitive behavior. *See Taylor*, 36 F. Supp. 2d at 372 ("Plaintiff did not submit any evidence that its loss of customers was caused by anticompetitive conduct on the part of Defendant."). We agree with the district court. While Taylor introduced circumstantial evidence of Jostens's intent to harm it and of its lost sales, it never linked its lost sales to the predatory hiring. Taylor argues that the jury should have been allowed to infer causation based on the nature of Jostens's conduct and the logical consequences of it. However, while in some cases jury inferences of causation are acceptable, "the required causal link must be proved as a matter or fact and with a fair degree of certainty." *Blue Bird Body Co.*, 573 F.2d at 317. Taylor fails to identify any instances where the only conduct we have identified as predatory—representative raiding—proximately caused it any economic injury. *See Foremost-*

-30-

*McKesson*, 527 F.2d at 420 ("[T]he evidence appellant presented on causation is both scarce and fatally general. Despite having introduced an enormous volume of exhibits, [plaintiff] failed to indicate and document specific losses of business to [itself] and corresponding gains by [defendant], or otherwise to show that their losses were cause by [defendant's] practices.").

As Taylor failed to provide sufficient evidence that the Jostens practice we have identified as predatory—representative raiding—materially contributed to its injuries, Taylor's attempted monopolization claim fails as a matter of law.

## IV

The trial court also found insufficient evidence to support the jury's finding that Jostens engaged in price discrimination in violation of the Robinson-Pat man Act. The Act proscribes predatory pricing under similar circumstances to § 2 of the Sherman Act. *See* 15 U.S.C. § 13(a); *Brooke Group*, 509 U.S. at 221-22, 113 S. Ct. 2578 ("[P]rimary-line competitive injury under the Robinson-Patman Act is of the same general character as the injury inflicted by predatory pricing schemes actionable under § 2 of the Sherman Act."). To recover, a plaintiff must show both below-cost pricing and a reasonable chance of recoupment. *See Brooke Group*, 509 U.S. at 222-24, 113 S. Ct. 2578.

As noted above, Taylor did not show that Jostens had a reasonable chance of recouping money lost through its below-cost pricing. Thus, the district court correctly granted JML to Jostens on the Robinson-Patman Act claim.

## V

Finally, Taylor challenges the district court's grant of JML on its state law claims of unfair competition, knowing participation in the breach of fiduciary duty, and conspiracy to breach fiduciary

duty.

## A

Taylor argued that Jostens committed the tort of unfair competition under Texas law when it engaged in sham pricing with Taylor customers. Taylor argues that Jostens was able to succeed in its sham pricing scheme through its misappropriation of Taylor's pricing information. The court overturned the jury verdict on this claim and granted judgment as a matter of law to Jostens.

Unfair competition under Texas law "is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974), *quoted in United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied). The tort requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business. *See Schoellkopf v. Pledger*, 778 S.W. 2d 897, 904-05 (Tex.App.—Dallas 1989, writ denied). Although the illegal act need not necessarily violate criminal law, it must at least be an independent tort. *See id.* ("Without some finding of an independent substantive tort or other illegal conduct, we hold that liability cannot be premised on the tort of 'unfair competition.'"); 70 TEX. JUR. 3d *Trademarks* § 33 (1999) (same). Taylor's unfair competition claim founders on this requirement, as Taylor has not established that Jostens's sham pricing, even abetted by its misappropriation of pricing information, was illegal or otherwise tortious.[15]

---

[15] Taylor's inability to show the necessary tort or criminal act underpinning its unfair competition claim is illustrated by its misreliance on cases involving misappropriation of trade names. In these cases, the defendant falsely sells goods under the plaintiff's trade name, thereby deceiving customers. *See, e.g., Hudgens v. Goen*, 673 S.W.2d 420, 423 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.). The harm complained of is the misuse of the plaintiff's name—the trade name is recognized as a form of intangible property created by the development of goodwill in the name. *See Thompson v. Thompson Air Conditioning and Heating, Inc.*, 884 S.W.2d 555, 558 (Tex.

**B**

Taylor argues that there was sufficient evidence to support the jury verdict on its claim that Jostens knowingly participated and conspired in former Taylor employees' breach of fiduciary duties and duty of loyalty. The district court overturned the jury verdict on this claim because, even assuming that Taylor had produced evidence indicating that Jostens's actions prompted Taylor employees to breach their duties, Taylor had not "offer[ed] evidence that the information [garnered from the breach] was used by [Jostens] to obtain market share." *Taylor*, 36 F. Supp. 2d at 374.

Taylor argues that the district court applied the incorrect legal standard because in breach of fiduciary duty cases, "every case requires a flexible and imaginative approach to the problem of damages." *University Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 538 (5th Cir. 1974). We do not disagree that, because damages are difficult to prove in breach of fiduciary duty cases, litigants and courts must be flexible and imaginative in calculating the proper measure of damages. However, as the district court noted, the fact that a flexible approach to the measurement of damages was necessary "does not excuse the need for [Taylor] to offer evidence that the information at issue was used by [Jostens] to obtain market share." *Taylor*, 36 F. Supp. 2d at 374.

Taylor offered evidence that Jostens acquired confidential information and that, during a similar time frame, Jostens's market share increased and Taylor lost customers. However, absent was any evidence to prove that Taylor's losses or Jostens's gains were caused by Jostens's acquisition of confidential information. Taylor argues that the law recognizes a sort of *res ipsa loquitur* for breach of fiduciary cases in that if a breach and damages are proven, causation is assumed. However, all of

App.—Texarkana 1994). This harm bears no analogy to Taylor's alleged harm, as Taylor has shown no property interest it had which Jostens deceptively used; instead, any harm suffered was experienced by Taylor's former customers.

the cases cited by Taylor reject this proposition, expressly recognizing the need to prove causation before a flexible approach to damages is relevant. *See Molex, Inc. v. Nolen*, 759 F.2d 474, 478-79 (5th Cir. 1985) (affirming a damages award when the plaintiff proved that the defendant's "misappropriation and use of [plaintiff's] trade secrets or confidential information was the proximate cause of loss to [plaintiff] and benefit to [defendant]"); *University Computing*, 504 F.2d at 539-41 (affirming a damages calculation where there was specific evidence that the defendant had offered the information to potential customers as if it was their own to hurt the plaintiff's business); *American Precision Vibrator Co. v. National Air Vibrator Co.*, 764 S.W.2d 274, 279 (Tex. App.—Houston [1st Dist.] 1988) (affirming a damages calculation when an expert testified that it "is a measurement of the financial result directly attributable to" the defendant's use of plaintiff's trade secret), *as modified* 771 S.W. 2d 562 (Tex. App.—Houston [1st Dist.] 1989, n.w.h.). Accordingly, the district court correctly rejected Taylor's conspiracy in and knowing participation in breach of fiduciary duty claims as a matter of law.

## VI

For the reasons stated, we affirm the district court's grant of judgment as a matter of law to Jostens. We dismiss Jostens's cross-appeal as moot.